## A02A2236. BURCHETTE v. THE STATE.
### (580 SE2d 609)

SMITH, Chief Judge.

Michael Lynn Burchette was indicted and convicted on one count of arson. His amended motion for new trial was denied, and he appeals. Burchette challenges the sufficiency of the evidence, the trial court's ruling with respect to one of his character witnesses, and the *Allen* charge given to the jury. We find no reversible error, and we affirm.

1. Burchette argues that the circumstantial evidence was insufficient to convict him. Construed in favor of the jury's verdict, evidence was presented that Burchette entered into a lease-purchase agreement with the victims under which he agreed to buy their home for $175,000. The agreement required Burchette to give the victims $5,000 earnest money and to pay monthly rent of $1,200. The closing was first set for August 1, 1999. After Burchette's family moved into the house in September 1998, he made a number of late rent payments and did not pay several late fees required under the contract. Burchette sought and obtained three extensions on the closing from August 1, 1999, through December 8, 1999. When the closing did not occur on December 8, the victims notified Burchette that the house would be placed back on the real estate market.

In response, the victims received a letter from Burchette requesting return of his $5,000 earnest money. The letter recited in part that Burchette and his family "have lost much more than you stand to gain in this ordeal and trust you will see the wisdom in the solution," that his "family had made this house their home and planned on being here for a while," and that the "house holds many memories for us and now hard feelings at the prospects of leaving. As I am sure that you can appreciate, the prospects [sic] of moving has come as quite an unexpected blow, especially around the holidays." The letter further recited, "If we must move, I am not inclined to have any other people impose upon my family. If you will not agree to sell the house to us as we agreed, then kindly return our down payment monies of five thousand dollars so we can place our goods in

storage and we can relocate." Burchette stated in the letter that his family would move out of the house within ten days after the return of their "down payment." The victims retained the earnest money based on language in the lease-purchase agreement requiring forfeiture of the $5,000 if Burchette failed to close.

The victims' attorney sent Burchette a letter in December demanding that Burchette vacate the home within 60 days. He paid no rent in January and February, even though he retained possession of it until mid-February. The victims and their realtor went to the home on February 15 to inspect it and get a key to the house; they were scheduled to take possession the next day. When they arrived at approximately 10:00 a.m., they rang the doorbell and were greeted by Burchette. He would not allow them inside the house. He "said that the house was a mess and that he wouldn't have allowed his family into it. He said that he was going to have it cleaned and would return the keys to us 12:00 noon the next day." The victims did not demand entry at that time because they "didn't want to create any more problems." The victims left the home at about 10:15. A few hours later, while they were shopping at a nearby mall, they received a telephone call from their realtor that the house was on fire. They returned to find several fire trucks at the home, which was "engulfed in black smoke."

A neighbor noticed smoke coming from the house at approximately 2:30 p.m. and contacted the fire department. Firefighters arrived at approximately 2:45 p.m. Steven Anderson, Chief Investigator with the Forsyth County Fire Department, arrived at the scene a short time later. According to Anderson, although "some clothing" was inside the house, along with a piano the victims intended to sell with the house, all rooms in the ranch-style home were "virtually empty." Anderson concluded that two separate fires were intentionally set in the basement: one in a storage room, and the other in a bathroom. Anderson estimated that the fire in the storage room had been burning approximately 30 minutes before the fire department first received a call about the fire from a neighbor at 2:39 p.m. Another expert, who was hired by the victims' insurance company to investigate the cause of the fire, similarly testified that in his opinion two fires were set in separate locations, the bathroom and the storage room. He testified that a person inside the house at 2:30 would have noticed the fire.

Anderson interviewed Burchette at the scene. Burchette told him that he had not experienced problems "with the utilities and the electrical." He did not know whether space heaters in the basement were turned on, and he mentioned to Anderson the presence of disposable charcoal grills and paint inside the house. Anderson, however, found no evidence that any of these items caused the fires.

Anderson testified that the space heaters were not plugged in and were "not in the area of origin of the fire." He learned from Burchette that no cigarette smoking had occurred in the house. Anderson eliminated the water heater as a source of the fire. In addition, he ruled out the probability that the fire was electrical in origin.

Anderson noticed that an area in the basement was filled with many combustible items, particularly boxes and bags of household goods. He observed a "flash pattern" in the basement between the storage room and the back door of the basement, which indicated to him that a flammable liquid had been poured on the carpet. Although forensic tests on carpet samples taken from this location were negative for the presence of an accelerant, expert testimony was presented that absence of evidence of ignitable liquid could have occurred because the liquid burned away, was washed away by the firefighters, or evaporated before the carpet sample was removed from the scene.

On the day after the fire, Anderson visited the house Burchette was renting, "a house that was fully furnished and lived in." Burchette told him that after his wife went to work and his children went to school, he took some household items to the new house, returned and talked with the victims, and then went back to the new house. He told Anderson that he returned to the victims' home at 2:30, ran inside to get a check, and then left and picked up his son at the bus stop. He stated that he and his son returned a few minutes later to get an item the boy wanted from the house and they discovered the house on fire.

The neighbor who contacted the fire department testified that after she called 911, she was standing outside with other neighbors and Burchette drove up with his son. He "drove up real quick and turned around." He appeared to be "nervous" and "excited" and asked what had happened. The neighbor found this behavior puzzling, because "the wind had died down," and no smoke was coming from the house at that time. He "looked real frightened" and ran inside the front door of the house. He returned with a rug and went to the back of the house.

To prevail on an arson charge, the State must prove that a fire was intentionally set by the defendant. See *Frost v. State*, 200 Ga. App. 267, 270 (3) (b) (407 SE2d 765) (1991). Proof that the defendant set the fire may be accomplished through circumstantial evidence. *Bragg v. State*, 175 Ga. App. 640, 641 (334 SE2d 184) (1985). It is undisputed that a fire occurred, and both the State's experts testified that two separate fires were intentionally set. All potential causes, with the exception of arson, were investigated and excluded as causes of the fires.

In addition to showing that the fires were intentionally set,

ample evidence was presented from which the jury could conclude that Burchette committed the crime. Mere presence at the crime scene is insufficient to convict an individual of the crime,

> but presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. Criminal intent may be found by the jury upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

(Citation and punctuation omitted.) *Griffin v. State*, 228 Ga. App. 200, 203 (1) (491 SE2d 437) (1997).

The basement contained combustible, unused items, particularly cardboard boxes. At the time of the fire, Burchette's family had moved their belongings into another house. Burchette was the only person inside the house at or near the time the fire began. A neighbor saw him leave the house between 2:10 and 2:20 p.m., and by his own admission to Anderson, he was inside the house at approximately 2:30 p.m. Evidence was presented, however, that the fire had been burning approximately 30 minutes before the fire department received a call at 2:39 p.m. and that anyone in the house at 2:30 p.m. would have noticed the fire. There was no evidence of forced entry before the firefighters arrived. The victims did not have a key to the residence, and it was undisputed that they were shopping at the time of the fire. The jury also heard evidence that Burchette appeared nervous when he returned to the scene at approximately 2:45 p.m., even though no smoke was flowing from the house, and no fire trucks were yet present. In addition, the jury heard evidence from which it could infer that Burchette was angry over the prospect of moving out of the house and losing his $5,000 earnest money deposit.

The evidence of Burchette's guilt was entirely circumstantial. "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6. Whether the circumstantial evidence was sufficient to exclude every other reasonable hypothesis save Burchette's guilt was an issue for the jury to determine. *Miners v. State*, 250 Ga. App. 443, 444-445 (1) (550 SE2d 725) (2001). We will "disturb the jury's verdict only where the evidence, even if circumstantial, is insupportable as a matter of law." (Footnote omitted.) Id. We cannot conclude that the jury's verdict in this case was "insupportable." Unlike the circumstantial evidence in *Collins v. State*, 202

Ga. App. 291 (414 SE2d 297) (1991),[1] cited by Burchette, evidence of Burchette's presence at the scene immediately before and after the fire began, his demeanor at the time of the fire, and his motive were all circumstances on which the jury could rely to find Burchette guilty of arson beyond a reasonable doubt. See *Griffin*, supra; *Parker v. State*, 181 Ga. App. 590-591 (1) (353 SE2d 83) (1987). Contrary to Burchette's argument that the evidence cast only a " 'bare suspicion' " of guilt upon him, the evidence in this case was sufficient to enable a rational trier of fact to convict him of arson under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Burchette argues that the trial court improperly excluded character testimony. He called four character witnesses, all of whom testified that he had a good reputation in the community with respect to calmness and his "lack of" spiteful, retaliatory, or irrational behavior. Burchette had previously worked for one of these witnesses. On cross-examination he testified that his opinion was "primarily" based on his "experience that I had with people that Michael worked with." He did state, however, that a few people outside of work had talked to him about Burchette's reputation.

The State objected to this witness's testimony, insofar as his opinion was based on his knowledge of Burchette obtained through business relationships. The court sustained the objection and instructed the jury that reputation character evidence "must be the reputation of . . . the defendant in the community in which he lives. It cannot be based upon reputation amongst his business acquaintances." The court then instructed the jury to disregard any testimony of the witness based on Burchette's reputation among those business acquaintances but that the jury could consider "other testimony" based on Burchette's reputation in the community in which he lived.

> The law does not confine the knowledge that a witness has of the defendant entirely to the community of the defendant's residence, for one familiar with his reputation where he practices his daily vocation may testify to that fact. *But this association must be long enough . . . as to the witness' relationship with the defendant in his community to lend the value judgment credence.*

(Citations omitted; emphasis supplied.) *Bush v. State*, 149 Ga. App.

---

[1] In *Collins*, we reversed the appellants' arson convictions. The State presented no evidence of motive, and the officers based the arson charges "on the perceived absence of clothing and family photographs" inside the home and the presence of photographs and " 'important' papers" in appellants' car and in one appellant's purse. Id. at 296. Evidence was presented, however, "that the investigators would have found additional clothing and photographs inside the mobile home had they but opened the cabinets and closets." Id.

448, 449 (4) (254 SE2d 453) (1979). Here, only a scant showing of the character witness's relationship to Burchette was shown. We therefore cannot conclude that the trial court erred in restricting the jury's consideration of this testimony. But even assuming without deciding that testimony concerning his knowledge of Burchette in the workplace was permissible, harm as well as error must be shown in order to warrant reversal. See, e.g., *Richardson v. State*, 253 Ga. App. 555, 556 (1) (560 SE2d 65) (2002). The trial court did not completely restrict this witness's testimony, and given the cumulative testimony of the other character witnesses concerning Burchette's good character, we find no harm requiring reversal.

3. During deliberations, the jury sent a note to the trial judge reciting that "the vote was ten (10) to two (2). We are hopelessly hung." In response, the trial court gave an *Allen* charge. Burchette objected to the portion of the charge stating that "This case must be decided by some jury selected in the same manner this jury was selected and there is no reason to think a jury better qualified than you would ever be chosen." He argued that the charge "leaves out the other alternative that the State may choose not to prosecute the case again . . . and we'd ask that that possibility be included." We find no error. The charge, as recited by the trial court, was given during deliberations on Burchette's guilt and was a correct statement of Georgia law. *Spaulding v. State*, 232 Ga. 411, 413-414 (4) (207 SE2d 43) (1974); see also *Renner v. State*, 260 Ga. 515, 519 (7) (397 SE2d 683) (1990). He has failed to show harm caused by the failure of the court to add language never before required in the charge in this State, and we find no basis for reversal.

*Judgment affirmed. Eldridge and Ellington, JJ., concur.*

DECIDED MARCH 20, 2003 —
RECONSIDERATION DENIED APRIL 7, 2003 —

*Banks, Stubbs, Neville & Cunat, Rafe Banks III*, for appellant.
*Philip C. Smith, District Attorney, Rand J. Csehy, Penny A. Penn, Assistant District Attorneys*, for appellee.